May it please the court, Lisa Michelle Lennart on behalf of petitioner Mr. Daniel Alberto Ramos, I'd like to reserve two minutes of rebuttal time. We're here today because the immigration judge improperly denied Mr. Alberto's application for cancellation of removal, finding that Mr. Alberto did not meet the continuous presence requirement. In the removal proceedings, Mr. Alberto provided direct testimony and corroborating evidence of his continuous presence in the United States during the statutory period. Nothing contradicted his evidence. The immigration judge made no adverse credibility findings. Even the government concedes on page 23 of its brief that the immigration judge did not make an adverse credibility finding as to Mr. And Mrs. Alberto when it stated that the immigration judge did not reject the Alberto's testimony as incredible. It was your client's burden to establish continuous presence, wasn't it? Yes, your honor. And to that end, he put on testimony from himself, his wife and some neighbors. Yes, your honor. And he also put on the record a good deal of documentary evidence. Yes, your honor. And after examining this, the IJ looked at the testimony, looked at the record and concluded there was a six month gap. Yes, your honor. Yes, your honor. And during that gap, the evidence established that Petitioner's wife had gone to Mexico City because of an ill parent or grandparent. Her grandmother had just passed away and her father was ill. And Petitioner's wife was pregnant at the time, didn't want to risk coming back across the border and had the child in Mexico City. Is that correct? Yes, your honor. None of this evidence that I've just described was contested in any way? No, none of that evidence, your honor. But based on that evidence, the IJ, isn't it a fair reading of the record to say that the IJ said, the proof you've offered does not convince me that you were physically present for this six months? No. What's wrong with that? No, your honor. Under this court's precedent, because the immigration judge, the immigration judge made no adverse credibility findings as to Mr. Alberto, or as to any of his corroborating evidence, both testimonial and documentary, the immigration judge should have accepted Mr. Alberto's evidence as true. It is true, but so what? Where's the proof, any of that evidence that shows that he was physically present in the United States during that six month period, particularly when there is evidence both before and after the April to October 1993 time period? Why isn't there a glaring negative pregnant, if you will, and no pun intended at all, really, that he has utility bills before, he has information after, his statement from his employer doesn't say he was present. It says I knew him in 1993. It doesn't say I saw him. Nobody, there's no evidence out of all of that, that can place him physically in the United States during that period of time. Is the IJ just supposed to ignore that? Your honor, there is certainly evidence during that time period that the immigration judge... What specifically places him, besides his general statement, he doesn't recall leaving during that time? Well, actually, your honor, I would say that he never stated, I don't recall leaving during that time. That was actually a misapprehension on the part of the immigration judge. In fact, Mr. Roberto specifically, clearly and consistently stated that he did not return to Mexico. There's numerous statements that he made on the record. In fact, the immigration judge made that improper finding that Mr. Roberto did not recall leaving the United States. But to answer your question, the evidence on the record, there was a May 26, 1993 electric bill. The stamp, the paid stamp on the bill is May 26, 1993. It's in Mr. Roberto's name. It's clear that Mr. Roberto was in the United States. His son was born in Mexico on April 12, 1993, but yet he was in the United States as he testified and has his corroborating witnesses testified. He has this May 26, 1993 electric bill. He also has testimony from Mrs. Rodriguez stating that she was positive that Mr. Roberto did not go to Mexico during that time and that he would often stop by and visit with her husband and her son. There's also testimony from Mrs. Rodriguez in the form of an affidavit, a credible, uncontroverted affidavit that Mr. Roberto was in the United States from his entry in December of 1988 until the date of the affidavit, which was March 1, 2002. Similarly, there's an affidavit from Mr. Roberto's brother, Oscar, stating that Mr. Roberto was in the United States from December 1988 through March 1, 2002, the date of the affidavit. Excuse me, where's the evidence in Exhibit, was it ER 197 or 224? The bill issue date is for May 6, 1993, but the service date is to May 4. Yes, Your Honor. The paid stamp, let's see, it is AR, right here, AR 337. And that is the May 1993 electric bill. And there is a paid stamp on there of May 26, 1993. That's the clearest version of the bill. There's another bill in the record as well. Well, and he testified he was here. Exactly. Testified he never went down to Mexico. And he testified he learned about the birth of the child by telephone when he called. And, but the, as I recall, the immigration judge said, well, you know, he didn't, he didn't, he didn't, that didn't sound plausible to him that, that he would, he would stay away from, from Mexico when his child was born. And that's what, that's what bothered the immigration judge. Yes, Your Honor. As, as pointed out in Mr. Roberto's supplemental brief, the immigration judge rejected Mr. and Mrs. Roberto's testimony based on the pure speculation on his part that Mr. Roberto must have gone to Mexico. He simply ignored the reality of the situation. As Mr. and Mrs. Roberto testified, Mr. Roberto needed to stay in the United States and pay rent and also pay for his family to come back across the border. At no point do the immigration judge consider the difficulty or the expense of Mr. Roberto or his family crossing the border. That simply, he simply ignored the reality of the situation, put himself in that situation, Your Honor. And as noted, he, he based his findings on a misapprehension of the facts. He stated in his, in his decision that the fact that Mr. Roberto does not recall leaving the United States during the birth of his son in the months thereafter is not persuasive. This rejection was based on the erroneous fact that Mr. Roberto did not recall leaving the United States. To the contrary, Mr. Roberto's ability to recall whether he had left the United States was never in doubt. He testified clearly and consistently that he had been in the United States since December, 1988, and that he had never left the United States. And the immigration judge is pure speculation, which is contradicted by the evidence in the record, did not provide a specific cogent reason for his rejection. The same failure to provide specific cogent reasons are present in the immigration judge's rejection of Mr. Roberto's testimony on the electric bills, where he simply said, I believe that he stopped paying the bills in approximately May, 1993. There's no evidence in the record to, to support that. In fact, it's directly contradicted by the record. Mr. Roberto testified that he paid the electric bills at that Glen Hill residence from 1992 to 1997. He never recalled the electricity ever being canceled. And he specifically stated that he lost documents during his move and that he tried to get the copies from the electric company and the electric company did not maintain records over eight years. And the immigration judge simply ignored this credible, uncontroverted testimony without providing a specific cogent reason. Can you give us the exact AR site? You can do this on rebuttal if you'd like, where your client said, I was here during that six month period of time. Yes, Your Honor. I, he, he stated that he was here as actually have it right here. He never left the United States after entry in December, 1988. That's AR 65. He also said he did not accompany his wife and daughter to Mexico because he was working and needed to pay the rent. And that's AR 74 and 116. And the discussion, his testimony regarding Mrs. Rodriguez, her husband and her son from January, 1993 through October, 1993 is at AR 157 to 159. And that's where he states that he saw Mrs. Rodriguez in January of 1993. And then he saw her husband and her son. It was indiscernible. And then he saw Mrs. Rodriguez again when he brought her, his son to her. And that's, that's his testimony corroborated by Mrs. Rodriguez, who said that he would stop by and visit with her husband and her son with whom he had developed a friendship. And sometimes she wasn't able to stay with them. And that's all in the record. You came out of here from, from Washington? Yes, Your Honor. Are you with some organization there? I am. I'm with a law firm in, in Washington, D.C. And we were appointed as pro bono counsel on this case. Which we very much appreciate, pro bono counsel. Thank you. What's your firm? It's McKenna, Long & Aldrich. Okay. They also have a Los Angeles office that I've been working at. Even if you're not paid, we appreciate you. Thank you. In closing, Your Honor, if I, if I may close and save some time for rebuttal as well. In closing, as stated in Mrs., Mr. Alberto's supplemental brief, Mr. Alberto's application and his forthright testimony also show that he's a worthy candidate for cancellation of removal. The immigration judge himself stated that if a higher court were to find that he had met continuous presence, he would be happy to see this case returned. That red is going up. That's because you're over time, not because you have time. Sorry, Your Honor. Okay. That's all, Your Honor. Thank you. All right. Our clocks are a little tricky. They start going back up and a lot of counsel think, oh, I've got all this time that, and it's really because you're over time. Not your fault. If the court please, I'm Marshal Tamor Golding from the Department of Justice representing Respondent. I would take at least from the order requiring the appointment of pro bono counsel that what this court is mostly interested in, at least I thought it was, was the effect of Lopez Alvarado on this case. Now, I would suggest that there is a, Lopez Alvarado does not compel a reversal in this case. Lopez Alvarado, there was no issue of an interrupted presence. The question was, was the person there from beginning to end. There were three employers and testimonial and documents which covered the alien's presence for the entire period. And even as the wife, she was not employed for the first part of her presence. So therefore she couldn't come up with documents, but she had two persons who specifically testified that she had been present all that time. Did the immigration judge in this case ever make an adverse credibility determination with respect to the petitioner? I would suggest, Your Honor, that if you mean an express one, no, but I would suggest that both in Lopez Alvarado in this one, if you understand, with one understanding at least of what a credibility determination is, in effect he did. The reason is this. The question that credibility puts at issue is, is what the applicant or the witness said happened, did it in fact happen the way he said that it did? Secondly, he has the burden of establishing that. So therefore, a lot of times the board or IJs think, let me back up, therefore, what an adverse credibility determination is at basis, in essence is, that the applicant didn't carry his burden. Therefore, now a lot of times judges think, however, that an adverse credibility determination is necessarily an affirmative determination that the witness is uncredible. And they are a little reluctant to say, in effect, you're a liar. So they don't make an adverse credibility determination. We see a lot of them that make adverse credibility. Sometimes they do, but sometimes they do not, is my point, Your Honor. But they know, they know that if they make an adverse credibility finding that, that, you know, in many instances, that's the ball game for the, for the applicant and he made no adverse credibility, explicit adverse credibility determination. I agree. He did not make an explicit one. What I am suggesting to the court. I think under our jurisprudence, we, that means to us that the testimony that was given was, was truthful. Well, I'm, let me say two things. One, I am suggesting to the court that when a fact finder says, in effect, you have not carried your burden and the burden is to establish the underlying facts that he has actually made an adverse credibility. No, no. He's just saying you haven't put enough evidence into. However, I, however, I will then refer you. Even if this is not so, I will refer you to section 12, 8 U.S.C. 1229 A. C. And first off the two things here, subsection B says that to carry the case, the, an applicant has to have testimony, which is not only credible, but also persuasive and sufficient to demonstrate. And therefore just credible. If you assume credible testimony is we're not going to call you a liar. He still has to show that it's persuasive. Okay. Let me, let me stop there and ask a couple of questions. First of all, it is, our case law is clear in the absence of a specific adverse credibility determination. We, we deem the testimony to be credible and that has been known for some time. And it was certainly known to this immigration judge at the time of this hearing, that's point one. Okay. Point two is let's, let's suppose hypothetically he had this immigration judge had said nothing about the gap, but simply listen patiently to all of the evidence. And at the end of the hearing said, I've heard all of your evidence. I've heard all of your testimony. I don't think you've met your burden denied. Where would we be? Uh, I think then you would probably at the very least send it back to explain why you think he didn't meet his burden, but that's not what happened in this case. This judge gave reasons for saying that, uh, the burden was not met. The basic reason was that here is an applicant who comes in with all of this all of this evidence, documentary evidence and so forth up until April. May. Or May. But even if it's May and even if he came back in September, that's still more than a 90 day gap. And therefore under the statute. But every witness, including himself, his wife, uh, the neighbor, all, all of that testimony was he was here. Uh, his testimony was, but of course his testimony is, uh, uh, let's say he has an interest in the case. His wife has an interest in the case. The neighbor's testimony, as I recall from the record, and I must admit this was not my case. So I, you know, I didn't read the record to begin with. And so I just basically took what I had in preparing for this case. But my understanding is that the neighbor, in fact, the, the IJ actually says it in his opinion that she got, uh, I forget if the word was vague or she really couldn't say, what she says was, I don't think that he left for Mexico. But, uh, she was not actually able to say that, yes, he was there. I saw him in April. I saw him in May. I saw him in June. I saw him in July. The husband and the wife both said specifically, the husband said, I was here in the United States the whole time. The wife said he was not with me in Mexico for the birth of the child. Uh, now, uh, was there any requirement that that be corroborated? Well, I would suggest this, your honor. Was there any requirement that that be corroborated? I'd say just the requirement that it be corroborated arose from the fact that he presented all this corroboration before, all this corroboration after. This, I think, enables the, uh, IJ to say, whoa, how come that one gap, there's no corroboration? Okay. We understand your argument. Am I through or? All right. Thank you. Okay. All right. We'll give you a minute. If you think you need it. Yes, your honor. Just one, um, actually two points, um, to follow up on that last point that, um, you just, uh, asked counsel. Uh, there was no corroboration requirement in this case. Um, under this court's precedent, uh, there are numerous cases that credible direct testimony alone is sufficient. And then if credible and applicants testimony must, um, uh, is deemed true and, um, there's no corroboration required, that's Kataria, um, Lopez Alvarado, Vera Viejas, um, and then I'll also, I just wanted to point out that there is, um, the government talks about all of this evidence before 19, um, uh, before this, this, uh, supposed gap period. In fact, there were only a few pieces of evidence before, um, that time period. Mr. Alberto was a part-time painter. Um, he had not opened a checking account. So the only documentary evidence he had, and this was looking back over 10 years, um, were a couple of electric bills, a cable bill in his brother's name. Um, and, um, uh, and certainly the YK letter, which, um, stated that they had known him since 1993. Um, and the documents certainly, uh, started and the, the large, um, amount of documents that he brought started in 1994, went up through 2001. Problem I have with your site to 157 to 159, I think that's what the IJ was focused on is that he says he saw Mrs. Rodriguez at the beginning of 93 and at the end of 93. And when the, uh, when he got, when they tried to pin him down as to when, all I could say is that he also saw, um, I saw her when I took my son at the, that was in 90, beginning of 93 and at the end of 93, and then I saw her husband and her son. That's as close as that fills in the in-between period that's relevant. Uh, yes. Your Honor, that question was specifically, um, this is on AR, uh, 157. And the question to, uh, Mr. Roberto was, um, I'm asking you specifically about the year 1993. Do you recall? And that's when he said, I only saw her in January of 93. And then I saw her husband and her son and that's indiscernible, but that was the question was specifically. But what's the timeframe as to when he saw the husband and son? Well, the question, um, was specifically as to 1993 and because it's indiscernible, we, we don't know for sure, but I believe that any reasonable fact finder would conclude that, um, that that testimony, along with the corroborating testimony by Mrs. Rodriguez, that he, that Mr. Roberto would stop by and visit with her husband and her son. Um, that, that, um, that, uh, that demonstrates that he further corroborates his testimony and the other testimony that he was in the United States during that time period. Nice try. Hmm. Okay. Thank you. We'll get to the next matter. Goodwin versus Shook.
judges: Pregerson, Hawkins, Fisher